Nos. 25-10420, 25-10426

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

In re:  Herbert Hirsch and Bonita Hirsch,
Petitioners.

In re:  Harvey Birdman and Diane Birdman,
Petitioners.

On Petition for Writ of Mandamus to the United States Tax Court
Case Nos. 28898-10, 5819-10, & 5821-10

BRIEF OF THE CENTER FOR TAXPAYER RIGHTS AS AMICUS CURIAE
IN SUPPORT OF NEITHER PARTY

Andrew Weiner
Kostelanetz LLP
601 New Jersey Ave, NW
Suite 260
Washington, D.C. 20001
Tel: (202) 875-8000
Fax: (212) 808-8108
aweiner@kostelanetz.com

Michael Todd Welty
Gray Proctor
Kostelanetz LLP
4279 Roswell Rd NE
Suite 208, #352
Atlanta, GA 30342
Tel: (404) 301-4791
Fax: (678) 680-7901
twelty@kostelanetz.com
gproctor@kostelanetz.com

*Counsel for Amicus*

**In re: Hirsch & In re: Birdman**
**(11ᵗʰ Cir. Nos. 25-10420 & 25-10426)**
**C-1 of 2**

**CERTIFICATE OF INTERESTED PERSONS**
**AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit

Rule 26.1-1, counsel hereby certifies that, to the best of their knowledge,

information, and belief, no publicly traded company or corporation has an interest

in the outcome of this appeal, and that the following other individuals and entities

have an interest in the outcome of this appeal:

Birdman, Diane, Petitioner

Birdman, Harvey, Petitioner

Center for Taxpayer Rights, Amicus

Commissioner of Internal Revenue, Respondent

DiRuzzo, III, Joseph A., Counsel for Petitioners

Fuerst, Mitchell S., Counsel for Petitioners (deceased)

Foster, II, Michael Von Krogh, Counsel for Respondent

Halpern, James S., Senior Judge, United States Tax Court

Harris, Rebecca Dance, Counsel for Respondent

Haungs, Michael J., Counsel for Respondent

Hirsch, Bonita, Petitioner

Hirsch, Herbert, Petitioner

**C-2 of 2**

Ittleman, Andrew S., Counsel for Petitioners

Jacobs, Julian I., Judge, United States Tax Court

Kiessling, William W., Counsel for Respondent

Klimas, Geoffrey J., Counsel for Respondent

Kolovrat, Monica A., Counsel for Respondent

Kostelanetz LLP, Counsel for Amicus

Lader, Daniel M., Counsel for Petitioners

Margulis Gelfand DiRuzzo & Lambson, Counsel for Petitioners

Olsen, Nina E., Amicus

Pfeifer, Brian A., Counsel for Respondent

Proctor, Gray, Counsel for Amicus

Rajotte, Christopher J, Counsel for Petitioners

Richman, Derek P., Counsel for Respondent

Riera, Jennifer Correa, Counsel for Petitioners

Thornton, Michael B., Senior Judge, United States Tax Court

Urda, Patrick J., Judge, United States Tax Court

Vasquez, Juan F., Judge, United States Tax Court

Weiner, Andrew, Counsel for Amicus

Welty, Michael Todd, Counsel for Amicus

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ..................................................................C-1

STATEMENT OF THE INTEREST OF THE *AMICUS CURIAE* ...........................1

STATEMENT OF THE ISSUE....................................................................2

SUMMARY OF THE ARGUMENT ..............................................................3

ARGUMENT ...........................................................................................4

    I.   Respondent's claims of tax penalties are "Suits at common law" that
presumptively must be heard by an Article III judge with the right to a
jury........................................................................................................4

        A.   Civil tax penalties award Respondent relief not available in
equity........................................................................................6

        B.   Civil tax penalties are analogous to suits at common law in the
Founding Era............................................................................7

    II.  The historical public rights exception for taxation does not extend to
civil tax penalties, which were treated as suits at common law until at
least 1864............................................................................................13

        A.   Before, during, and for many years after the Founding Era, tax
penalties were collected through the judicial process .......................14

        B.   The public rights exception for tax *revenues* does not extend to
civil tax *penalties* ...............................................................19

    III. Tax penalties may not be assessed and collected administratively or by
authority of the Tax Court..........................................................................22

CONCLUSION .......................................................................................23

APPENDIX ................................................................................... App-1

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*Adams v. Woods*,
    6 U.S. 336 (1805) ..............................................................................16

*Austin v. United States*,
    509 U.S. 602 (1993) ............................................................................5

*Barnes v. Commissioner*,
    T.C. Memo 2016-79) ................................................................... 11, 13

*C.J. Hendry Co. v. Moore*,
    318 U.S. 133 (1943) ............................................................................9

*Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*,
    494 U.S. 558 (1990) ............................................................................6

*Commissioner v. Est. of Leyman*,
    344 F.2d 763 (6th Cir. 1965) ..........................................................14

*Curtis v. Loether*,
    415 U.S. 189 (1974) ............................................................................7

*Davis v. Commissioner*,
    184 F.2d 86 (10th Cir. 1950) ..........................................................11

*Granfinanciera, S.A. v. Nordberg*,
    492 U.S. 33 (1989) ..............................................................................7

*Helvering v. Mitchell*,
    303 U.S. 391 (1938) ............................................................................6

*Helwig v. United States*,
    188 U.S. 605 (1903) ............................................................................6

*Marsh v. Chambers*,
    463 U.S. 783 (1983) ..........................................................................14

*Mertens v. Hewitt Assocs.*,
   508 U.S. 248 (1993) ..................................................................5, 6

*Murray v. Hoboken Land & Improvement Co. (Murray's Lessee)*,
   59 U.S. 272 (1855) ............................................................. 13, 19, 19

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
   597 U.S. 1 (2022) .......................................................................18

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012) ...................................................................21

*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
   458 U.S. 50 (1982) ........................................................... 4, 13, 19

*Oceanic Steam Navigation Co. v. Stranahan*,
   214 U.S. 320 (1909) ...................................................................21

*Pernell v. Southall Realty*,
   416 U.S. 363 (1974) ....................................................................4, 5

*Phillips v. Commissioner.*,
   283 U.S. 589 (1931) ............................................................. 19, 19

*Recklitis v. Commissioner*,
   91 T.C. 874 (1988) .....................................................................11

*Securities and Exchange Commission v. Jarkesy*,
   603 U.S. 109, 144 S. Ct. 2128 (2024) ..................................... *passim*

*Stern v. Marshall*,
   564 U.S. 462 (2011) ....................................................................4, 13

*The Margaret*,
   22 U.S. 421 (1824) .....................................................................15

*Tull v. United States*,
   481 U.S. 412 (1987) .......................................................... 5, 6, 11

iv

*Walz v. Tax Comm'n of New York*,
   397 U.S. 664 (1970) ...................................................................14

**Constitution and Statutes**

U.S. CONST.:

   *Article III, Section 1 ...................................................... *passim*
   *Seventh Amendmdent ....................................................... *passim*

An Act laying Duties on stamped Vellum, Parchment and Paper,
   1 Stat. 527 (1797)...................................................................15

An Act laying duties upon Carriages for the conveyance of Persons
   1 Stat. 373 (1794).................................................................. 15

An Act to Establish the Judicial Courts of the United States,
   1 Stat. 73 (1789)....................................................................15

Act of August 4, 1790, 1 Stat. 145................................................15

Act of July 22, 1813, 3 Stat. 22....................................................16

Act of July 24, 1813, 3 Stat. 44....................................................16

Act of August 2, 1813, 3 Stat. 77.................................................16

Act of December 21, 1814, 3 Stat. 152.........................................16

Act of January 18, 1815, 13 Stat. 180..........................................16

Act of April 19, 1816, 3 Stat. 291................................................16

Act of February 28, 1839, 5 Stat. 321–22.....................................16

Act of August 5, 1861, 12 Stat. 292.............................................17

Act of July 1, 1862, 12 Stat. 432.................................................17

Dodd-Frank Wall Street Reform and Consumer Protection Act,
   124 Stat. 1376 (2010).............................................................2

Hearth Tax of 1662 (Eng.) ...............................................................8

House Tax of 1696 (Eng.) .................................................................8

Internal Revenue Act of June 30, 1864, 13 Stat. 223 ...............................18

Internal Revenue Code, (26 U.S.C.):

§ 32 ......................................................................... 3,7
§ 6201 ........................................................................23
*§ 6662 ................................................................ *passim*
*§ 6663 ................................................................ *passim*
§ 6664 ................................................................ 12, 13
§ 6671 ........................................................................22
§ 7441 ........................................................................22

Navigation Act of 1651 (Eng.).........................................................8

Navigation Act of 1660 (Eng.).........................................................8

Navigation Act of 1663 (Eng.).........................................................8

Navigation Act of 1696 (Eng.).........................................................8

Revenue Act of 1862, 12 Stat. 432 ............................................... 14, 18

Revenue Act of March 2, 1867, 15 Stat. 471..................................... 18, 19

Stamp Act of 1765 (Eng.) ..............................................................10

Stamp Act of 1797, 1 Stat. 527 .......................................................15

Sugar Act of 1764 (Eng.) ...............................................................9

Tax Act of April 24, 1863 (Confederate) .............................................17

Whiskey Tax of March 3, 1791, 1 Stat. 199 .........................................13

Wilson-Gorman Tariff Act of 1894, 53 Stat. 509................................. 10, 18

**Other Authorities**

2A SPEISER, KRAUSE, GANS, AMERICAN LAW OF TORTS § 9:1
(Monique C. M. Leahy, ed., Feb. 2024) ........................................................12

Ann Woolhandler, *Judicial Deference to Administrative Action – A
Revisionist History*, 43 ADMIN. L. REV. 197 (1991)...........................................16

Bryan Camp, *A History of Tax Regulation Prior to the Administrative
Procedure Act*, 63 DUKE. L.J. 1673 (2014)..........................................................14

Caleb Nelson, *The Constitutionality of Civil Forfeiture*, 125 YALE L.J.
2446 (2016)..........................................................................................................11

CONG. RSCH. SERV., CONSTITUTION ANNOTATED,
https://constitution.congress.gov/browse/essay/artIII-S2-C1-12-
2/ALDE_00013650/ (last visited Nov. 12, 2024)..............................................10

Donald Arthur Winslow, *Tax Penalties - "They Shoot Dogs, Don't
They?"*, 43 FLA. L. REV. 811 (1991)....................................................................14

EDMUND S. MORGAN & HELEN M. MORGAN, THE STAMP ACT CRISIS:
PROLOGUE TO REVOLUTION, 24-25 (3rd ed. 1953) ...............................................9

H.R. REP. NO. 101-386 (1989)......................................................................................7

H.R. REP. NO. 111-687 (2010).......................................................................................2

I.R.M. § 20.1.1.2.1(8) ....................................................................................................7

INTERNAL REVENUE SERV., EXECUTIVE TASK FORCE FOR THE
COMMISSIONER'S PENALTY STUDY, REPORT ON CIVIL TAX
PENALTIES (1989), https://www.taxnotes.com/tax-notes-today-
federal/irs-task-force-releases-penalty-reform-
proposals/1989/02/27/16vwq?........................................................................7

*Roger Kirst, *Administrative Penalties and the Civil Jury: The
Supreme Court's Assault on the Seventh Amendment,* 126 U. PA. L.
REV. 1281 (1978) ........................................................................10, 20, 21

S. Rep. No. 97-494 (1982) ...........................................................................................7

Susan McDonald, *A Case of Statutory Misinterpretation: An 1839 Limitation on a Form of Debt Action is being Misapplied to Limit Modern Regulatory Proceedings*, 49 AM. U.L. REV. 659 (2000)........................17

U.S. Dep't of Treasury, Comm'r of Revenue, No. 8, Circular to Collectors of the Revenue (1814).......................................................16

## STATEMENT OF THE INTEREST OF THE *AMICUS CURIAE*

The Center for Taxpayer Rights ("the Center") submits this brief pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure and its motion for leave to file as *amicus curiae*.[1] The Center is a non-profit organization under section 501(c)(3) of the Internal Revenue Code dedicated to furthering taxpayers' awareness of and access to taxpayer rights.[2] The Center accomplishes its mission, in part, by educating the public and government officials about the role taxpayer rights play in promoting compliance and trust in systems of taxation and by engaging in litigation regarding taxpayer rights, as in this case. The Executive Director of the Center, and source of its authority to file this brief, is Nina E. Olson, who from 2001 through 2019, served as the IRS National Taxpayer Advocate, appointed under section 7803(c)(1)(B).

Recently, in *Securities and Exchange Commission v. Jarkesy*,[3] the Supreme Court struck down the portions of the Dodd-Frank Act that gave the SEC jurisdiction

---

[1] Pursuant to Rule 29(a)(4)(E) of the Federal Rules of Appellate Procedure, this is to affirm that no party's counsel authored this brief in whole or in part and no party or party's counsel contributed money that was intended to fund preparing or submitting this brief. Counsel for the Center is also counsel for Ornstein-Schuler Investments, LLC, which did contribute money intended to fund the preparation of this brief.

[2] Unless otherwise stated, all uses of the terms "section," "sections," or "I.R.C." herein refer to the Internal Revenue Code of 1986, as amended, in effect at all relevant times.

[3] 144 S. Ct. 2117 (2024).

1

to recover its own fraud penalties in proceedings before an administrative law judge without a jury.[4]  Respondent's assertion of fraud and accuracy-related penalties in deficiency proceedings is equivalent because deficiency cases in the Tax Court are decided by a Tax Court judge without a jury in contravention of the Seventh Amendment and without an independent judge as guaranteed by Article III of the Constitution.

The Center for Taxpayer Rights submits this brief as *amicus curiae* in support of protecting the constitutional right to a jury trial and an independent judge in the context of significant and potentially life-changing penalties.  These are two of many cases raising the Seventh Amendment regarding claims of tax penalties following *Jarkesy*.  At issue is access to fundamental procedural protections before taxpayers are required to pay tax penalties and interest.

## STATEMENT OF THE ISSUE

Whether Respondent can assess and collect tax penalties non-judicially, without a jury trial under the Seventh Amendment or an independent judge under Article III of the Constitution.

---

[4] In 2010, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act), 124 Stat. 1376. The Dodd-Frank Act "ma[de] the SEC's authority in administrative penalty proceedings coextensive with its authority to seek penalties in Federal court."  H. R. REP. NO. 111-687, at 78 (2010).

## SUMMARY OF THE ARGUMENT

Petitioners argue in this mandamus action that Respondent's claims of fraud penalties under section 6663 are "Suits at common law" for which the right to a jury trial is guaranteed by the Seventh Amendment.[5]  Suits at common law also must be heard by an independent judge with life tenure and salary protections under Article III.  Still further, suits at common law describe claims for other tax penalties including accuracy-related penalties under section 6662 asserted against Petitioners.  The implication of Petitioners' argument is that Respondent must bring suits for fraud and accuracy-related penalties in an Article III court affording taxpayers the right to a jury trial.

Following the Supreme Court's analysis in *Jarkesy*, actions to enforce tax penalties are "Suits at common law" because the monetary recovery is not solely equitable in nature, and because the penalties are analogous to suits at common law recognized in the Founding Era.  Second, the public rights exception does not apply to tax penalties because the tradition dating back to the Founding was that tax penalties were enforced in Article III courts.  Therefore, the Tax Court has no

---

[5] The same reasoning applies to the fraud penalty under section 32(k), which prohibits low-income taxpayers from claiming the earned income tax credit for 10 years when they improperly claim the credit due the fraud and for 2 years when they improperly claim the credit due to reckless or intentional disregard of rules and regulations.  The applicability of the Seventh Amendment is critically important to all taxpayers, including low-income taxpayers.

3

authority to determine tax penalties against Petitioners or any other taxpayer.

We address these points in turn.

## ARGUMENT

I. **Respondent's claims of tax penalties are "Suits at common law" that presumptively must be heard by an Article III judge with the right to a jury**

The Seventh Amendment guarantees a jury in all "Suits at common law, where the value in controversy shall exceed twenty dollars."[6]  Article III of the Constitution guarantees that the "judicial power of the United States," required to decide the same class of suits at common law, will be exercised only by judges who "shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office."  Deciding suits at common law requires an exercise of the judicial power of the United States under Article III.[7]

The suit-at-common-law inquiry turns on whether an action would have been heard at law or in equity if brought in the Founding Era.[8]  This, in turn, depends on

---

[6] U.S. CONST. AMEND. VII.

[7] *See Stern v. Marshall*, 564 U.S. 462, 484 (2011) ("When a suit is made of 'the stuff of the traditional actions at common law tried by the courts at Westminster in 1789,' and is brought within the bounds of federal jurisdiction, the responsibility for deciding that suit rests with Article III judges in Article III courts.") (quoting *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 90 (1982) (Rehnquist, J., concurring)).

[8] *See Jarkesy*, 144 S. Ct. at 2128 ("[T]he right is not limited to the 'common-law

both the nature of the remedy and the degree of similarity to a recognized suit at common law, with the remedy being "the 'more important' consideration."[9]

Historically "only courts of law issued monetary penalties to 'punish culpable individuals'"; courts of equity were limited to "return[ing] unjustly obtained funds."[10] Moreover, any punitive component renders a monetary award a penalty under *Jarkesy*, which explained that "a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment."[11] Substantive and procedural features analogous to a recognized suit at common law also are relevant. This second test is satisfied when there is a "close relationship" to a historical suit at law without necessarily being "identical."[12]

Fraud and accuracy-related penalties satisfy both of the *Jarkesy* tests.

---

forms of action recognized' when the Seventh Amendment was ratified. . . . [T]he Framers used the term 'common law' in the Amendment 'in contradistinction to equity, and admiralty, and maritime jurisprudence.'" (internal citations omitted)); *Pernell v. Southall Realty*, 416 U.S. 363, 370 (1974) ("[W]here an action is simply for the recovery . . . of a money judgment, the action is one at law." (internal citations omitted)).

[9] *Jarkesy*, 144 S. Ct. at 2129 (quoting *Tull v. United States*, 481 U.S. 412, 422 (1987)).

[10] *Id.* (explaining that money damages "are the prototypical common law remedy" (citing *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993)).

[11] *Id.* (quoting *Austin v. United States*, 509 U.S. 602, 610 (1993)) (internal quotations marks omitted).

[12] *Id.* at 2131.

5

### A.   Civil tax penalties award Respondent relief not available in equity

An award of monetary damages signifies a suit at common law, unless the remedy is strictly equitable in character, such as disgorgement or restitution.[13]  Fraud and accuracy-related penalties are imposed on top of an assessment for unpaid tax and interest and are computed as a percentage of the underpayment based on the level of taxpayer's culpability, *e.g.,* negligence, gross negligence, fraud, etc.  Simply put, the penalties are keyed to the taxpayer's wrongdoing in order to punish and deter such conduct.[14]  The legislative history of section 6662 and section 6663 underscores that they are designed to punish and deter.[15]  Respondent moreover provides that

---

[13] *Id.* at 2129 ("While monetary relief can be legal or equitable, money damages are the prototypical common law remedy." (citing *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993)); *see also Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 572 (1990) (finding claim to be legal in nature because relief sought was not "disgorgement of improper profits" or "incident to or intertwined with injunctive relief") (citing *Tull*, 481 U.S. at 424).

[14] *See, e.g.*, *Helvering v. Mitchell,* 303 U.S. 391, 399 (1938) ("To ensure full and honest disclosure, to discourage fraudulent attempts to evade the tax, Congress imposes sanctions."); *Helwig v. United States*, 188 U.S. 605, 610–11 (1903) (explaining that a surtax on undervaluation of imported goods is a "penalty" for jurisdictional purposes because it is intended to punish and "operates as a warning to importers to be careful and to be honest . . . which is efficacious only by reason of the resulting imposition of the 'further sum,' in addition to the duties, provided for by the statute").

[15] *See* H.R. REP. NO. 101-386, at 661 (1989) (Conf. Rep.) (concluding that "IRS should develop a policy statement emphasizing that civil tax penalties exist for the purpose of encouraging voluntary compliance"); S. Rep. No. 97-494, at 272–73 (1982) (explaining that the accuracy-related penalty is designed to deter taxpayers from playing the "audit lottery" by providing a "downside risk [to] taking highly questionable positions on their tax returns"); *see also* INTERNAL REVENUE SERV.,

civil tax penalties should: "Be severe enough to deter noncompliance"; "Encourage noncompliant taxpayers to comply"; "Be objectively proportioned to the offense"; and "Be used as an opportunity to educate taxpayers and encourage their future compliance."[16]    Respondent's stated goals are deterrence and proportionality between offense and punishment.

### B.    Civil tax penalties are analogous to suits at common law in the Founding Era

The second test of a suit at common law is whether the suit is analogous to a recognized suit at common law.  In *Jarkesy*, the Court found that the SEC's fraud penalties are analogous to common-law fraud.  Fraud and accuracy-related penalties are directly analogous to the tax penalties in existence in 1789 and 1791, which were sued for and recovered in a jury action at common law.[17]  They are also analogous to three common law causes of action:  actions in debt, fraud, and negligence.

---

EXECUTIVE TASK FORCE FOR THE COMMISSIONER'S PENALTY STUDY, REPORT ON CIVIL TAX PENALTIES, at 19 (1989), https://www.taxnotes.com/tax-notes-today-federal/irs-task-force-releases-penalty-reform-proposals/1989/02/27/16vwq?highlight=%22REPORT%20ON%20CIVIL%20TAX%20PENALTIES%22%201989 ("Civil tax penalties should exist for the purpose of encouraging voluntary compliance and not for other purposes, such as the raising of revenue."). The penalty under section 32(k) serves exclusively to deter. Taxpayers who improperly claim the earned income tax credit are barred from claiming the credit going forward, costing them access to an important part of the social safety for up to a decade. The Government is not compensated at all for the cost of investigating abuse of the credit.

[16] I.R.M. § 20.1.1.2.1(8).

[17] *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41–42 (1989) ("Although 'the thrust of the Amendment was to preserve the right to jury trial as it existed in 1791,'

In England, the Crown recovered monetary tax penalties through suits at common law.[18]  This continued on American soil, where the jury tradition for penalties began long before independence, as a part of British regulation of colonial trade.  The Navigation Act of 1651 required all trade with England and the colonies to be carried on in English or colonial vessels, a system which the Acts of 1660, 1663, and 1696 perpetuated. [19]  The Navigation Acts functioned as taxes because the requirement to use British ships and to pass through British ports strengthened enforcement of customs duties.  Penalties for violating the Navigation Acts were

---

the Seventh Amendment also applies to actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty." (quoting *Curtis v. Loether,* 415 U.S. 189 (1974)).

[18] At the time of the Founding, suits at common law for tax penalties had been standard practice in England.  For example, the Hearth Tax of 1662 and the House Tax of 1696, required that taxes be assessed and collected by distraint but that penalties be pursued by, for example, "any Suite or Proceeding by Action of Debt Bill Plaint or Information or otherwise for the Recovery of all or any the Paines Penalties or Forfeitures . . . ."  House Tax of 1696, ch. XVIII (Eng.), https://www.british-history.ac.uk/statutes-realm/vol7/pp86-94  ("An Act for granting to His Majesty severall Rates or Duties upon Houses for making good the Deficiency of the clipped Money."); Hearth Tax of 1662, ch. VI, XII, XX (Eng.), https://www.british-history.ac.uk/statutes-realm/vol5/pp390-393.

[19] Navigation Act of 1651 (Eng.),    https://llds.ling-phil.ox.ac.uk/llds/xmlui/bitstream/handle/20.500.14106/A74432/A74432.html?sequence=5&isAllowed=y.  The 1651 Act was passed by the Parliament of Oliver Cromwell's Commonwealth.  When the monarchy was restored in 1660, the new Parliament renewed the earlier legislation.  Navigation Act of 1660 (Eng.), https://www.digitalhistory.uh.edu/disp_textbook_print.cfm?smtid=3&psid=4102; Navigation Act of 1663 (Eng.), https://www.british-history.ac.uk/statutes-realm/vol5/pp449-452; Navigation Act of 1696 (Eng.), https://www.british-history.ac.uk/statutes-realm/vol7/pp218-238.

8

sued for and recovered by the Crown or its agents.[20]  In the Colonies, the common-law courts took on the duties of adjudicating these suits.[21]  Thus, the first national tax penalties on American soil were collected in suits at common law.

As relations deteriorated with the Colonies, Britain continued to collect monetary penalties by suit at common law but deprived colonists of the right to a jury.  The Sugar Act of 1764 provided that penalties on its trade taxes must be sued for and recovered, maintaining the right of jury trial in Great Britain but denying it to the colonists.[22]  Section 58 of the infamous Stamp Act of 1765 similarly gave

---

[20] The Navigation Act of 1660 provided for a share of the forfeiture of offending ships and cargo to those who "who shall seize, inform, or sue for the same in any court of record, by bill, information, plaint, or other action," as did the Acts of 1663 and 1696, *supra* note 19.  The Navigation Act of 1696, *supra* note 19, awards a share of penalties "to such person or persons who shall sue for the same, to be recovered in any of his Majesty's courts at Westminster . . . or in the court of admiralty held in his Majesty's plantations respectively . . . ."

[21] *C.J. Hendry Co. v. Moore*, 318 U.S. 133, 138–40 (1943) ("By [1700 or shortly thereafter], the jurisdiction of common law courts to condemn ships and cargoes for violation of the Navigation Acts had been firmly established, apparently without question, and was regularly exercised throughout the colonies.").

[22] Sugar Act of 1764, ch. 40 (Eng.), https://avalon.law.yale.edu/18th_century/sugar_act_1764.asp.  Chapter 40 of the Sugar Act gave jurisdiction to "any of his Majesty's courts of record at Westminster, or in the court of Exchequer in Scotland," when a penalty is "incurred in Great Britain."  Chapter 41, however, denied colonists the right to a jury trial by giving courts of admiralty and vice-admiralty jurisdiction over "all the forfeitures and penalties inflicted by this or any other act or acts of parliament relating to the trade and revenues of the said British colonies or plantations."  *Id.* at ch. 41; s*ee* EDMUND S. MORGAN & HELEN M. MORGAN, THE STAMP ACT CRISIS: PROLOGUE TO REVOLUTION, 24–25 (3rd ed. 1953) (App-1) ("More important, once a violation had been detected it should be prosecuted in the

jurisdiction to juryless vice-admiralty courts.[23]    These circumstances would

contribute to the revolution.[24]

At the time of the Founding, monetary tax penalties continued to be enforced

by suits at common law.  Notably, the same year the Bill of Rights was ratified,

Congress enacted the Whiskey Tax of March 3, 1791, which provided for penalties

to be "recoverable with costs of suit, by action of debt."[25]  As the Supreme Court

explained in *Tull v. United States*, "[a]ctions by the Government to recover civil

penalties under statutory provisions . . . historically have been viewed as one type of

---

admiralty courts.  These courts, operating without juries, had been deciding maritime cases in the colonies since 1697 . . . .").

[23] Chapter 58 of the Stamp Act of 1765 provided that forfeitures and penalties "shall and may be prosecuted, sued for and recovered, with full costs of suit, in any court of record within the kingdom, territory, or place, where the offence shall be committed, in such and the same manner as any debt or damage, to the amount of such forfeiture or penalty, can or may be sued for and recovered."  Stamp Act of 1765, ch. LVII (Eng.), https://avalon.law.yale.edu/18th_century/stamp_act_1765.asp.

[24] *See* Roger Kirst, *Administrative Penalties and the Civil Jury: The Supreme Court's Assault on the Seventh Amendment,* 126 U. PA. L. REV. 1281, 1296 (1978) ("The absence of a jury [for cases heard in courts of Vice-Admiralty] was one of the major complaints voiced by the colonists."); *see also* CONG. RSCH. SERV., CONSTITUTION ANNOTATED,       https://constitution.congress.gov/browse/essay/artIII-S2-C1-12-2/ALDE_00013650/ (last visited Nov. 12, 2024) ("Denial to the colonists of trial by jury in the vice-admiralty courts helped to motivate the colonists' 1776 Declaration of Independence, which cited the British King depriving the colonists in many cases, of the benefits of Trial by Jury as a justification for separating from Great Britain.").

[25] Whiskey Tax of March 3, 1791, ch. 15, § 44, 1 Stat. 199, 209 (providing for penalties for taxes on distilled spirits).

action in debt requiring trial by jury."[26]  These suits at common law are the closest historical analogue to modern tax penalties.

Fraud and accuracy-related penalties also bear close relationship to common law fraud and negligence.  In *Jarkesy*, the Supreme Court found a "close relationship" between federal securities fraud and common law fraud on grounds that "[b]oth target the same basic conduct: misrepresenting or concealing material facts," and that "Congress deliberately used 'fraud' and other common law terms of art . . . [and i]n so doing, Congress incorporated prohibitions from common law fraud into federal securities law."[27]  The fraud penalty also targets the same basic conduct as common law fraud and draws upon common law terminology and concepts.[28]

Similarly, "negligence" in section 6662(b)(1) targets the same basic conduct as common-law negligence, namely, the failure of a person owing a duty of care to

---

[26] 481 U.S. 412, 418–19 (1987); *see also* Caleb Nelson, *The Constitutionality of Civil Forfeiture*, 125 YALE L.J. 2446, 2518 (2016) (citing cases in nn.249–251 & 261).

[27] 144 S. Ct. at 2130.

[28] *See Recklitis v. Commissioner*, 91 T.C. 874, 909 (1988) ("Fraud is established by proving that the taxpayer intended to evade tax believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such tax."); *see also Davis v. Commissioner*, 184 F.2d 86, 87 (10th Cir. 1950) ("Fraud implies bad faith, intentional wrong doing and a sinister motive.") (citing 37 C.J.S. Fraud § 2, at 210).

do what a reasonable person would have done under the circumstances.[29]  Even when negligence under section 6662(b)(1) is not alleged, the accuracy-related penalty turns on negligence because the "reasonable cause" and "good faith" defense is equivalent to showing that the taxpayer was not negligent.[30]  Beyond penalizing negligent conduct, the accuracy-related penalty reflects its common law roots by borrowing terminology and concepts such as "negligence" and "reasonable cause."

Respondent's claims of fraud and accuracy-related penalties are suits at common law for purposes of the Seventh Amendment and Article III.  In the following section amicus will explain why they are not within the limited judge-created "public rights" exception to the Constitution's text.

---

[29] 26 U.S.C. § 6662(c) ("For purposes of this section, the term 'negligence' includes any failure to make a reasonable attempt to comply with the provisions of this title"); *see* 2A SPEISER, KRAUSE, GANS, AMERICAN LAW OF TORTS § 9:1 (Monique C. M. Leahy, ed., Feb. 2024) ("[N]egligence is the failure of a person owing a duty to another to do what a reasonable and prudent person would ordinarily have done under the circumstances . . . .").

[30] I.R.C. §§ 6662(b)(1), 6664(c)(1); *see Barnes v. Commissioner*, T.C. Memo. 2016-79 at 11–12 (explaining that reasonable cause and good faith requires demonstrating "ordinary business care and prudence," "an honest belief," and "intent to perform all lawful obligations").

**II.  The historical public rights exception for taxation does not extend to civil tax penalties, which were treated as suits at common law until at least 1864.**

The Supreme Court recognizes a narrow "public rights" exception to the textual guarantees of the Seventh Amendment and Article III.[31]  The exception applies to matters that fit the definition of a suit at common law, but nevertheless "historically could have been determined exclusively by the [executive and legislative] branches."[32]  As the Supreme Court in *Jarkesy* emphasized, the public rights exception is firmly rooted in history, which serves as a check against expanding what "is, after all, an *exception*" with "no textual basis in the Constitution."[33]  Accordingly, "the presumption is in favor of Article III courts" for suits at common law.[34]

Nonjudicial tax collection was established and accepted in 1789 and 1791.[35]  However, there is no doctrinal basis for extending that exception to the text of Article III and the Seventh Amendment to include penalties as well.  Moreover, tax penalties

---

[31] *Jarkesy*, 144 S. Ct. at 2132.

[32] *Id.* (citing *Stern*, 564 U.S. at 493; *Murray v. Hoboken Land & Improvement Co.* (*Murray's Lessee*), 59 U.S. 272, 284 (1855)) (alterations in original) (citation and internal quotation marks omitted).

[33] *Id.* at 2134 (emphasis in original) (observing that *Murray's Lessee* "took pains to justify the application of the exception . . . by explaining that it flowed from centuries-old rules concerning revenue collection by a sovereign").

[34] *Id.* (citing *Northern Pipeline*, 458 U.S. at 69 n.23 (1982) (plurality opinion)).

[35] *See Murray's Lessee*, 59 U.S. 272, 277–80 (describing the history).

have a different history: From independence through the Civil War, they were imposed through suits at common law, with an Article III judge and jury. The more recent practice of imposing civil tax penalties without a right to jury trial "cannot justify contemporary violations of constitutional guarantees."[36]

## A. Before, during, and for many years after the Founding Era, tax penalties were collected through the judicial process

The colonial tradition of tax penalty collection at common law persisted until the Civil War.[37] "Between 1789 and 1862, Congress filled the federal fisc mainly through external taxes, in the form of tariffs, or customs duties, imposed on imported goods."[38] Internal taxes "were generally indirect taxes, excises – taxes imposed upon an event or the exercise of a right."[39] Nor were there any internal taxes at all from 1802 to 1813, or from 1817 to 1861.[40] But when they existed, they were collected by suits at common law. Early Congresses continued to provide that tax

---

[36] *Marsh v. Chambers*, 463 U.S. 783, 790 (1983); *see also Walz v. Tax Comm'n of New York*, 397 U.S. 664, 678 (1970) ("[N]o one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it.").

[37] Revenue Act of 1862, ch. 119, § 11, 12 Stat. 432, 435–36.

[38] Bryan Camp, *A History of Tax Regulation Prior to the Administrative Procedure Act*, 63 DUKE. L.J. 1673, 1685 (2014).

[39] Donald Arthur Winslow, *Tax Penalties – "They Shoot Dogs, Don't They?"*, 43 FLA. L. REV. 811, 821–23 (1991) (internal quotations omitted).

[40] *Commissioner v. Est. of Leyman*, 344 F.2d 763, 770 (6th Cir. 1965), *vacated sub nom., Est. of Leyman v. Commissioner*, 383 U.S. 832 (1966).

penalties "shall and may be sued for."[41]  The right to a jury trial attended these suits.[42]

Thus, penalties to enforce the Whiskey Tax of 1791 were "recoverable with costs of suit, by action of debt."[43]  The Carriage Tax of 1794 also included tax penalties that "shall and may be sued for."[44]  Tax penalties enacted as part of the Stamp Act of 1797 also had to be "sued for,"[45] as did other ratification-era tax penalties.[46]

During the 1813-to-1817 period of internal taxation, to finance the War of 1812, statutes similarly provided that fines, penalties, and forfeitures incurred

---

[41] *See, e.g.*, An Act laying Duties on stamped Vellum, Parchment and Paper, ch. 11, § 20, 1 Stat. 527, 532 (1797) (providing all fines, penalties and forfeitures incurred upon a tax on commercial paper "shall be sued for and recovered in the name of the United States . . . in any circuit or district court of the United States, or in any court . . . of the said states . . . ."); An Act laying duties upon Carriages for the conveyance of Persons, ch. 45, § 10, 1 Stat. 373, 375 (1794) ("Carriage Tax Act of 1794"); Stamp Act of 1797, Ch. 11, § 20, 1 Stat. 527, 532 (1797); *see also The Margaret*, 22 U.S. 421, 427 (1824) (describing "shall and may be sued for" language in Chapter 128 of the Revenue Act of March 2, 1799).

[42] An Act to Establish the Judicial Courts of the United States, ch. 20, § 12, 1 Stat. 73, 80 (1789) (providing that "the trial of issues of fact in the circuit courts shall, in all suits, except those of equity, and of admiralty and maritime jurisdiction, be by jury").

[43] Whiskey Tax of March 3, 1791, ch. 15, § 44, 1 Stat. at 209.

[44] Ch. 45, § 10, 1 Stat. 373, 375 (1794).

[45] Ch. 11, § 20, 1 Stat. 527, 532 (1797).

[46] *See, e.g.,* Act of August 4, 1790, ch. 35, § 67, 1 Stat. 145, 176; Whiskey Tax of March 3, 1791, ch. 15, § 25, 1 Stat. at 205 (internal revenue law establishing that forfeiture for failing to disclose liquor production or storage "to be recovered by action, with costs of suit, in any court proper to try the same").

15

thereunder "may be sued for . . . by bill, plaint, or information."[47]  Thus, even for nominally criminal penalties, in the "early republic . . . [t]he judiciary also oversaw the collection of fines and forfeitures for citizens' violations of the internal revenue and customs laws."[48]

Internal taxes disappeared in 1817, but the general tradition of collecting even criminal penalties as suits at common law persisted.[49]  When internal taxes resumed in 1861, once again tax penalties were imposed by suits at common law.

---

[47] *See, e.g.*, Act of April 19, 1816, ch. 58, § 14, 3 Stat. 291, 294; Act of January 18, 1815, ch. 22, § 21, 3 Stat. 180, 185–186; Act of December 21, 1814, ch. 14, § 21, 3 Stat. 152, 157 (penalties for violations related to duties and licensing of spirits distilled in the United States); Act of August 2, 1813, ch. 52, § 13, 3 Stat. 77, 80; Act of July 24, 1813, ch. 26, § 10, 3 Stat. 44, 47 (penalties on import tax on spirits); Act of July 22, 1813, ch. 14, § 14, 3 Stat. 22, 28–29 (penalties for fraud or intent to evade direct taxes and internal duties); *see also* U.S. Dep't of Treasury, Comm'r of Revenue, No. 8, Circular to Collectors of the Revenue (1814) (App-6).

[48] Ann Woolhandler, *Judicial Deference to Administrative Action – A Revisionist History*, 43 ADMIN. L. REV. 197, 207 (1991); s*ee, e.g., Adams v. Woods*, 6 U.S. 336, 341 (1805) (explaining that "[a]lmost every fine or forfeiture under a penal statute, may be recovered by an action of debt as well as by information."); *see also* Susan McDonald, *A Case of Statutory Misinterpretation:  An 1839 Limitation on a Form of Debt Action is being Misapplied to Limit Modern Regulatory Proceedings*, 49 AM. U.L. REV. 659, 661 (2000) (explaining that "until at least the late nineteenth century, what we now would call regulatory statutes commonly prescribed the forfeiture of a specific sum of money or specific property as the mandatory consequence for a violation [and historically] were considered to be criminal in nature.").

[49] In 1839, Congress provided a general statutory vehicle for civil recovery of monetary penalties. Act of February 28, 1839, ch. 36, §§ 1–4, 5 Stat. 321–22 (providing in section 3 that "all pecuniary penalties and forfeitures accruing under the laws of the United States may be sued for and recovered").

Section 54 of the Act of August 5, 1861 mandated that "all fines, penalties, and forfeitures . . . shall and may be sued for and recovered, in the name of the United States, or of the collector . . . in any proper form of action, or by any appropriate form of proceeding, before any circuit or district court of the United States . . . ."[50] Tax fraud was a criminal offense, but the only penalty was a fine "not exceeding five hundred dollars," collectible through a suit at common law.[51]

It was the constitution-straining emergency of the Civil War that led subsequent generations to discard the jury trial right the Founders fought for. Although it directed tax penalty collection to suits at common law, the Revenue Act of 1862 also imposed an "additional tax" of 50 percent for failure to make a return, as well as administrative penalties for belated payment.[52] The Confederacy expanded administrative penalty collections in an income tax passed in 1863, which imposed administrative penalties for failure to file returns and for filing false or fraudulent returns.[53] The next year the United States followed suit. The Revenue Act of 1864 included a fraud penalty by which the assessor could add 100 percent to the tax, though Congress did not denominate it a penalty, as the Act still required

---

[50] Act of August 5, 1861, ch. 45, § 54, 12 Stat. 292, 312.

[51] *Id.* at § 16, 12 Stat. at 298.

[52] Act of July 1, 1862, ch. 119, §§ 11, 92, 12 Stat. 432, 435, 474.

[53] Tax Act of April 24, 1863, §§ 8 (false returns), 10 (refusal to file), https://docsouth.unc.edu/imls/taxasses/taxasses.html.

17

suits at common law for penalties.[54]  Three years later, in the Revenue Act of 1867

Congress referred to the fraud penalty as a penalty and allowed the government to

assess and collect it without suit.[55]  Collections of penalties by assessment and

addition to tax has been a general feature of American tax procedure ever since.[56]

But there was no tradition of imposing tax penalty administratively that

extends back to the time the Constitution and the Seventh Amendment were

ratified, and therefore the public rights exception does not apply.  Contrast this

history with the collection of tax revenue, which, as discussed below, the Supreme

Court has recognized falls within the public rights exception based on "an unbroken

tradition . . . long predating the founding" of non-judicial enforcement.[57]  Thus,

under *Jarkesy*, the public rights exception does not apply to the penalties under

section 6662 or section 6663.

---

[54] *See* Internal Revenue Act of June 30, 1864, ch. 173, §§ 14, 41, 13 Stat. 223, 226, 239.

[55] *See* Revenue Act of March 2, 1867, ch. 169, §§ 3, 8, 13, 15 Stat. 471, 471–72, 473, 477–80.

[56] *E.g.*, Wilson-Gorman Tariff Act of 1894, ch. 349, § 29, 53 Stat. 509, 554.

[57] *Jarkesy*, 144 S. Ct. at 2132; *see id.* at 2134 n.2 (finding it "unclear how practice could transmute a private right into a public one, or how the absence of legal challenges brought by one generation could waive the individual rights of the next"); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 34–36 (2022) (explaining that "when it comes to interpreting the Constitution, not all history is created equal" and that courts must "guard against giving postenactment history more weight than it can rightly bear"; "to the extent later history contradicts what the text says, the text controls").

### B.     The public rights exception for tax *revenues* does not extend to civil tax *penalties*

The public rights exception does apply to revenue collection. However, the "underlying principle" of the public rights exception for taxes is the historically recognized "need of the government promptly to secure its revenues," justifying collection "by summary administrative proceedings." [58] Penalties are not part of the tax base and need not be collected as taxes to be effective.[59] More importantly, there is no Founding Era tradition of administrative tax penalty collection.

Nor is there any authority holding that the Seventh Amendment and Article III do not apply to tax penalties. The Supreme Court first described matters of public right in an 1855 case, *Murray v. Hoboken Land & Improvement Co.* (*Murray's Lessee*).[60] In *Murray's Lessee*, the defendant obtained title to land by auction, after the government seized the land pursuant to a distress warrant.[61] The plaintiff, a customs collector, had been found to owe $1,374,119.65 after an audit.[62] There is a

---

[58] *Phillips v. Commissioner*, 283 U.S. 589, 595 (1931).

[59] Kirst, *supra* note 24, at 1295 ("The often-stated reason for allowing nonjudicial collection of taxes was the absolute necessity that the government be able to collect quickly the revenue needed for operating . . . . Fines and penalties need not be collected so quickly because the purpose of the fine or penalty is to control conduct or punish offenses and only more incidentally to raise revenue.").

[60] 59 U.S. 272 (1855); *see also Northern Pipeline*, 458 U.S. at 67 ("The 'public rights' doctrine was first set forth in *Murray's Lessee*.").

[61] *Murray's Lessee*, 59 U.S. at 274.

[62] *Id.* at 275.

strong historical tradition of summary procedures to recover funds withheld by a tax collector.[63]  Accordingly, the Court concluded that using "summary means to compel these officers . . . to pay such balances of the public money as may be in their hands" did not "differ in principle" from historically available remedies.[64]

The other public rights case on taxation is *Phillips v. Commissioner*.[65]  The relevant statute subjected shareholders receiving assets of a dissolved corporation to unpaid corporate taxes "in the same manner as that of any delinquent taxpayer;" before the law was passed, transferee liability had to be established "by bill in equity or action at law."[66]  The taxpayer asserted that the statute was unconstitutional "because it does not provide for a judicial determination of the transferee's liability at the outset."[67]  The *Phillips* Court did not extend full procedural protections because the measure was designed solely "to collect the revenue."[68]  As the Court explained, the "right of the United States to collect its internal revenue by summary administrative proceedings has long been settled."[69]  Indeed, "[t]he typical

---

[63] *Id.* at 280–84.

[64] *Id.* at 281–82.

[65] 283 U.S. 589 (1931).

[66] *Id.* at 592.

[67] *Id.* at 593.

[68] *Id.* at 594.

[69] *Id.*

eighteenth century collection procedure allowed the collector to seize or distrain the property of the tax debtor and then to sell the property . . . the method was nonjudicial and did not involve the courts at any stage from assessment to collection."[70]

Tax penalties were treated differently from taxes themselves, and these cases provide no support for the notion that tax penalties ride along with taxes generally. Moreover, tax penalties are not like the immigration-related penalties determined to come within the public rights exception in *Oceanic Steam Navigation Co. v. Stranahan* because historically "the authority of Congress over the right to bring aliens into the United States embraces every conceivable aspect of that subject," including the ability "to sanction [immigration-related] prohibitions by penalties enforceable by administrative authority."[71]  With taxation, the historical evidence specifically reveals that the government's authority to administratively collect taxes did not include authority to impose and collect tax penalties.

In sum: civil tax penalties are not taxes for Constitutional purposes, notwithstanding the language in section 6201(a) describing taxes to include "additions to the tax" and "assessable penalties."[72]  No direct authority situates tax

---

[70] Kirst, *supra* note 24, at 1294–95.

[71] 214 U.S. 320, 340 (1909).

[72] *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544–46 (2012) (recognizing that "Congress cannot change whether an exaction is a tax or a penalty for *constitutional* purposes" by using a different label, and remarking that amicus's

penalties within the recognized public rights exception for primary taxes, and there are many good reasons not to include them.  The history of tax penalty collection through suits at common law stands separate and distinct from the generally recognized public rights exception for tax revenues.

## III.   Tax penalties may not be assessed and collected administratively or by authority of the Tax Court

It follows that Respondent cannot assess and collect fraud and accuracy-related penalties without bringing suit in an Article III court, affording taxpayers the right to a jury trial, and that the current statutes authorizing the assessment and collection of tax penalties as an addition to tax are unconstitutional.[73]  Moreover, because the Tax Court is established under Article I, it could not authorize recovery of the penalties even if Congress made a jury trial available.[74]  Instead, Respondent should be required to raise the penalties in a suit in an Article III court that can constitutionally exercise the judicial power of the United States.

---

"observation that the Code requires assessable penalties to be assessed and collected 'in the same manner as taxes' makes little sense if assessable penalties are themselves taxes" (emphasis in original)).

[73] *Cf.* I.R.C. § 6201(a) ("The Secretary is authorized and required to make the inquiries, determinations, and assessments of all taxes (including . . . additions to the tax, and assessable penalties). . ."); I.R.C. § 6671(a) ("The penalties and liabilities provided by this subchapter shall be paid upon notice and demand by the Secretary, and shall be assessed and collected in the same manner as taxes.").

[74] I.R.C. § 7441.

## CONCLUSION

For the foregoing reasons, this Court should recognize that taxpayers' fundamental rights under the Seventh Amendment and Article III require that Respondent's claims for tax penalties include the right to a jury trial and be brought before an Article III court.

Respectfully Submitted,

/s/ Andrew Weiner          _
ANDREW WEINER
Kostelanetz LLP
601 New Jersey Ave, NW
Suite 260
Washington, D.C. 20001
Tel: (202) 875-8000
Fax: (212) 808-8108
aweiner@kostelanetz.com

/s/ Todd Welty          _
MICHAEL TODD WELTY
Kostelanetz LLP
4279 Roswell Rd NE
Suite 208, #352
Atlanta, GA 30342
Tel: (404) 301-4791
Fax: (678) 680-7901
twelty@kostelanetz.com

/s/ Gray Proctor          _
GRAY PROCTOR
T.C. Bar No. PG21707
Kostelanetz LLP
4279 Roswell Rd NE
Suite 208, #352
Atlanta, GA 30342
Tel: (404) 301-4791
Fax: (678) 680-7901
gproctor@kostelanetz.com

Dated: March 28, 2025

# **APPENDIX**

EDMUND S. MORGAN & HELEN M. MORGAN, THE STAMP ACT CRISIS:
    PROLOGUE TO REVOLUTION, 24-25 (3rd ed. 1953) (excerpt)........................ App-1

U.S. Dep't of Treasury, Comm'r of Revenue, No. 8,
    Circular to Collectors of the Revenue (1814)............................................... App-6

Copyright © 1953. Omohundro Institute of Early American History & Culture. All rights reserved.



# the Stamp Act CRISIS

## PROLOGUE TO REVOLUTION

### EDMUND S. MORGAN
### & HELEN M. MORGAN

WITH A NEW PREFACE BY EDMUND S. MORGAN

Morgan, Edmund S., and Helen M. Morgan. The Stamp Act Crisis :
        Prologue to Revolution, Omohundro Institute of Early American History & Culture, 1953. F
Created from nyulibrary-ebooks on 2024-09-13 20:39:16.

EDMUND S. MORGAN & HELEN M. MORGAN

# *The Stamp Act Crisis*

## Prologue to Revolution

With a New Preface by Edmund S. Morgan

Copyright © 1953. Omohundro Institute of Early American History & Culture. All rights reserved.



Published for the Institute of Early American History and Culture,

Williamsburg, Virginia, by

The University of North Carolina Press

Chapel Hill and London

Morgan, Edmund S., and Helen M. Morgan. The Stamp Act Crisis : Prologue to Revolution, Omohundro Institute of
    Early American History & Culture, 1953. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=43
Created from nyulibrary-ebooks on 2024-09-13 20:39:16.

Copyright © 1953. Omohundro Institute of Early American History & Culture. All rights reserved.

The Institute of Early American History and Culture is
sponsored jointly by The College of William and Mary and
the Colonial Williamsburg Foundation.

© 1953, 1995 by The University of North Carolina Press
© 1962 by Edmund S. Morgan
All rights reserved

Library of Congress Cataloging-in-Publication Data
Morgan, Edmund Sears.
The Stamp Act crisis : prologue to revolution / by
Edmund S. Morgan and Helen M. Morgan : with a new
preface by Edmund S. Morgan.
p. cm.
Includes bibliographical references and index.
ISBN 0-8078-4513-2 (pbk. : alk. paper)
1. Great Britain. Stamp Act (1765) 2. United States—History—
Revolution, 1775–1783—Causes.   I. Morgan, Helen M.
II. Institute of Early American History and Culture
(Williamsburg, Va.)   III. Title.
E215.2.M58 1995
973.3′111—dc20   94-31357   CIP

The paper in this book meets the guidelines for permanence
and durability of the Committee on Production Guidelines for
Book Longevity of the Council on Library Resources.
Manufactured in the United States of America

06 05 04 03 02   7 6 5 4 3

Morgan, Edmund S., and Helen M. Morgan. The Stamp Act Crisis : Prologue to Revolution, Omohundro Institute of
   Early American History & Culture, 1953. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=43
Created from nyulibrary-ebooks on 2024-09-13 20:39:16.

customs duties had been designed to regulate the flow of trade rather than fill the Treasury. To obtain a satisfactory revenue from them, he would have to get Parliament to revise them with this purpose in view. While customs officers hurried to their posts and naval officers took up stations along the Atlantic coast, he was already preparing recommendations and by March 9, 1764, had them ready. On that day and the days following, his suggestions were presented to an attentive House of Commons in a series of resolutions. He himself introduced the first proposals, covering a new schedule of duties.[9]

The proposals would affect many branches of colonial commerce. Madeira, the staple of trade with the Wine Islands, was for the first time to bear a duty, £7 a ton. Drawbacks (customs duties refunded on re-exportation) on European and Asian textiles exported from Great Britain to the colonies were to be discontinued, and new duties placed on coffee, pimiento, foreign indigo, and foreign sugar. Lumber and iron bound for Europe must be shipped first to England. Foreign rum was to be prohibited. Most important of all, the duty on foreign molasses was to be reduced from 6d. to 3d. a gallon.

Two days after proposing these alterations in duties the Ministry called for an amendment in the means of collecting and enforcing them.[10] Violators were to be detected through an elaborate system of bonds and cockets which would reveal exactly what a vessel was carrying and where she had previously called. More important, once a violation had been detected it should be prosecuted in the admiralty courts. These courts, operating without juries, had been deciding maritime cases in the colonies since 1697, but their jurisdiction in some colonies had been contested by the common-law courts, and in others the judges had fallen under the influence of local merchants. As a result, smugglers had frequently been acquitted by sympathetic judges or juries. Customs officers had pleaded for a strenghtening of the admiralty courts and an extension of their jurisdiction; and Lord Colville, the admiral in charge of American waters, supported them. Colville thought the remedy for local influence was to have violations of the Acts of Trade tried at Halifax, where his flagship was stationed.[11] Grenville agreed. He recommended that Parliament

9 *Journals of the House of Commons*, XXIX, 934–935. Accounts of Grenville's speech may be found in a letter of Edward Montague April 11, 1764, quoted in *Virginia Gazette* (Purdie & Dixon), October 3, 1766; and in a letter of Israel Mauduit, March 10, 1764, Massachusetts Archives, XXII, 357.

10 *Journals of the House of Commons*, XXIX, 940.

11 Colville to Philip Stephens, October 25, 1763, Admiralty Secretary In Letters 482, Public Record Office, Library of Congress transcripts.

Copyright © 1953. Omohundro Institute of Early American History & Culture. All rights reserved.

Morgan, Edmund S., and Helen M. Morgan. The Stamp Act Crisis : Prologue to Revolution, Omohundro Institute of
    Early American History & Culture, 1953. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=43
Created from nyulibrary-ebooks on 2024-09-13 20:39:16.

give the admiralty courts clear jurisdiction over the Acts of Trade; and he arranged for an order in council to establish a new court at Halifax with original jurisdiction over cases that customs officers in any colony chose to bring before it.[12] To free the customs officers still further from local pressures, he recommended giving them immunity from retaliatory damage suits by merchants. If a collector seized a ship but failed to prove his case against her, he should not be liable for his error, provided the judge was satisfied there had been a probability of guilt.[13]

If Parliament was at all interested in reforming the administration of the colonies, here was a profitable place to begin.[14] If not, the Ministry could defend its recommendations on more familiar ground: though designed to raise money, the new duties, like the old, would regulate colonial trade for the welfare of the mother country. They would, in fact, bring new benefits to British merchants and manufacturers. The heavy duty on Madeira was designed to break the monopoly which that Portuguese product had acquired over the colonial wine market. American ships carried pipe staves and provisions to the Azores and had hitherto returned with pipes of Madeira in the hold duty free. As a result Madeira was plentiful in America, and the colonists had grown fond of it. Though they would still be able to buy it—at a price—they were expected to shift to cheaper wine, obtainable from English merchants. The abolition of the drawback on foreign textiles (a luxury for which the rich could well afford to pay a higher price) would cause the colonies to buy more British textiles. British linens might not be as good as French, but they were adequate and would improve with the encouragement thus given them. To be sure, the high prices might lead the Americans to set up linen manufactures themselves, but the possibility seemed remote, since labor was so dear in the

12 *Acts of the Privy Council, Colonial,* IV, 663–664. C. M. Andrews, *The Colonial Period of American History* (New Haven, 1934–1938), IV, 222–271; Carl Ubbelohde, *The Vice-Admiralty Courts and the American Revolution* (Chapel Hill, 1960).

13 These measures will be found in the Act as passed, 4 George III, c. 15, Danby Pickering, ed., *The Statutes at Large . . .* (Cambridge, 1762–1807), XXVI, 40–52. They were apparently not embodied in specific resolutions beforehand. For the terms of the act see E. S. Morgan, *Prologue to Revolution: Sources and Documents on the Stamp Act Crisis* (Chapel Hill, 1959), 4–8.

14 The official ministerial defense was offered by Thomas Whately in *The Regulations Lately Made,* which seems to have followed the lines laid down by Grenville in his speech of March 9. The ensuing two paragraphs are based largely on *The Regulations Lately Made,* 58–87. A selection from the pamphlet is in *Prologue to Revolution,* 17–23.

Copyright © 1953. Omohundro Institute of Early American History & Culture. All rights reserved.

Morgan, Edmund S., and Helen M. Morgan. The Stamp Act Crisis : Prologue to Revolution, Omohundro Institute of
    Early American History & Culture, 1953. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=43
Created from nyulibrary-ebooks on 2024-09-13 20:39:16.

**G56541**

United States. Revenue Office.

(Circular to collectors of the revenue, no. 8.) Treasury Department, Revenue Office, June 5, 1814. : Sir, The general and chearful [sic] acquiescence of our citizens in the payment of the internal duties is a correct subject for felicitation. ... As, however, there will doubtless be, from time to time, some infractions of these laws, it becomes proper seasonably to provide the means for carrying them impartially into effect, by enforcing the penalties attached to a non-compliance with them. ... -- [Washington, D.C. : s.n., 1814] -- [4] p. ; 26 cm.

**AAS copy**

311401

# [Circular to Collectors of the Revenue, No. 8.]

## TREASURY DEPARTMENT,

*Revenue Office, June 5, 1814.*

SIR,

The general and chearful acquiescence of our citizens in the payment of the Internal duties is a correct subject for felicitation. Notwithstanding the difficulties necessarily incident to a new system of taxation, of which the various constructions to which all laws are exposed and an unacquaintance either with their existence or with their precise provisions are not the least embarrassing, it appears to have been carried into effect in a manner equally honorable to those on whom it operates and to those directly charged with its execution.

As, however, there will doubtless be, from time to time, some infractions of these laws, it becomes proper seasonably to provide the means for carrying them impartially into effect, by enforcing the penalties attached to a non-compliance with them.

The provisions of the several laws on this head are so clear and explicit as to need little explanation. They assign to the Collectors duties, which they are bound in all cases, where the law is unambiguous, to discharge, and, where doubtful, to resort to their instructions or to this office for advice.

It is proper, however, distinctly to state that there is no power under the laws given to any branch of the Executive, either to a Collector or to the Treasury Department, to dispense with them. It is only, consequently, in cases where their meaning is doubtful, that either can interpose. Considerations, therefore, arising from the general character of those who may have incurred a penalty, or from their poverty, can have no weight, where the penalty is unequivocally incurred. The only legal resort in such cases, where no intention of fraud or wilful neglect appears to have existed, is to the mitigating and remitting powers of the Secretary of the Treasury; in such cases a collector may properly, during the period while such a resort is had, refrain, so far as depends upon him, from the institution of a prosecution.

No prosecution should be commenced without the previous possession or rational expectation of proof adequate to a conviction; nor should prosecutions be generally instituted where there is no prospect of the prosecuted being able to pay the costs of suit, except in case of a flagrant violation of law persisted in, when an immediate prosecution should take place.

You have been already advised of the necessity of circumspection in obtaining, before commencing a prosecution, the requisite proof for supporting it. To this end it will be invariably proper, before a suit is brought, to lay the proof you possess before the Attorney, and to be governed by his advice. Should you have reason to think this advice incorrect, you may submit the case, with its circumstances minutely stated, to this office for a special instruction.

Although you will be necessarily guided, on the subject of the requisite proof, by the advice of the Attorney, it may be, nevertheless, useful to state (although involving a partial repetition of what has been heretofore stated) the nature of the proof required to sustain a prosecution in the cases that are most important and most likely to occur.

For using a still in distilling spirituous liquors without a license, the person doing it, or causing it to be done, or the owner of the still, or the person having the still under his superintendance, either as agent or otherwise, is liable to a penalty of one hundred dollars and double duties.

To recover the penalty it will be necessary to prove, 1. The possession and use of the still in distilling spirituous liquors. 2. The time during which it was used. 3. The materials employed in distilling, whether domestic or foreign. 4. The capacity of the still.

For retailing Wines, distilled spirituous liquors, or foreign merchandize, without a license, a penalty of one hundred and fifty dollars together with the amount of the duty is incurred. To recover this penalty it will be necessary to prove, 1. The time of retailing. 2. The articles and in what quantities retailed. 3. The person by whom retailed. 4. The person to whom retailed, and 5. The places of retailing, if the penalty be incurred for selling under one license at more than one place at the same time.

In all cases of prosecution it will be desirable that disinterested testimony should be adduced, and that, consequently, whether the Collector or other person be the informer, some other witness should be had.

By the Act of the 24th of September, 1789, it is provided that "there shall be appointed in each [judicial] district a meet person learned in the law to act as Attorney for the United States in such district, who shall be sworn or affirmed to the faithful execution of his office, whose duty it shall be to prosecute in such district all delinquents for crimes and offences, cognizable under the authority of the United States and all civil actions in which the United States shall be concerned, except before the Supreme Court

in the district in which that court shall be holden;" and that "he shall receive as a compensation for his services such fees as shall be allowed therefor in the respective courts before which the suits or prosecutions shall be." By the Act of the 28th of February, 1799, a more specific compensation is provided.

By the laws of the United States cognizance of suits or prosecutions for fines, forfeitures or penalties arising under the acts laying internal duties is given exclusively to the district court of the United States, if the cause of action or complaint shall arise or accrue within fifty miles from the nearest place of holding such court, and to such court concurrently with any court of the state, holden within the district, having jurisdiction in like cases, if the cause of action or complaint shall arise or accrue more than fifty miles distant from the nearest place by law established for the holding of a district court within such district.

Hence results in the latter cases a discretion to commence prosecutions in the courts of the United States or of the States.

In all cases where the convenience of a Collector and that of the party prosecuted admits, prosecutions should be commenced in the district court; they should likewise be commenced in this court, whenever they are of considerable consequence, either in regard to the amount of the penalty or of the principle involved in the decision, and, further, in all cases in which an apprehension is entertained that the decision in a state court will not be impartial, of which the Collector will be governed by the opinion of the Attorney for the district. In all these cases the attorney for the district will be exclusively employed to commence prosecutions, receiving therefor the compensation, fixed by law, as above stated, and none other.

In other cases prosecutions should be commenced before such court of the state holden within the [judicial] district, and having jurisdiction in like cases, as from its vicinity combined with its respectability, will the most effectually promote the ends of justice. It is to be observed that, although motives of convenience recommend the institution of prosecutions in the *nearest* court, there is no positive obligation imposed to commence them in such court, particularly where it does not possess the requisite characteristics for insuring a speedy and impartial issue, and where there is another tribunal having jurisdiction sufficiently near. In these cases it will be proper to employ, either the attorney of the United States for the district, such attorney as he may substitute in his stead residing either in the collection district, or sufficiently near it to be conveniently accessible, or, if the attorney for the district be too remote and there be no substitute for him, then, and then only, such attorney of respectability as the Collector may see fit.

Where Counsel, other than the Attorney for the United States, is employed, it is considered proper that he should receive such reasonable compensation as is usually given by individuals for like services. It may be advisable to employ an attorney, with the understanding that he shall have all the business of the Collector. As, in most districts, a large portion of this will be transacted without much trouble, particularly that part which regards the suing of unpaid bonds, it is presumed that the attorney will agree to do the whole business for the legal fees that may accrue. Whether this shall be so, or otherwise, it will be necessary to make an agreement, previous to employing him, in which the terms shall be distinctly stated, one of which must be that so far as regards any claim beyond legal fees, the amount is not to be paid until after presenting the account therefor through the Collector to this office, (which is not to be done until the suit is determined, judgment given, and the proceeds, if any, obtained) and its allowance at the Treasury, where, it is to be understood, that it will be allowed or modified accordingly as it shall be considered reasonable. Collectors, in forwarding these accounts, will make such explanations thereon as they may think useful.

These are the principles in accordance with which it is thought proper to regulate common cases. In extraordinary cases, on a proper representation to this office, authority to employ additional counsel, or to pay additional compensation, will, where it is considered expedient, be given.

By the 5th section of the Act of May 8th, 1792, entitled "An Act for regulating processes in the Courts of the United States," &c. it is enacted that "in every prosecution for any fine or forfeiture incurred under any statutes of the United States, if judgment is rendered against the defendant, he shall be subject to the payment of costs: and on every conviction for any other offence not capital, the court may in their discretion award that the defendant shall pay the costs of prosecution: and if any informer or plaintiff on a penal statute, to whose benefit the penalty or any part thereof if recovered, is directed by law to accrue, shall discontinue his suit or prosecution, or shall be non-suit in the same, or if upon trial a verdict shall pass for the defendant the court shall award to the defendant his costs, unless such informer or plaintiff be an officer of the United States specially authorised to commence such prosecution, and the court before whom the action or information shall be tried, shall, at the trial in open court, certify upon record, that there was reasonable cause for commencing the same, in which case no costs shall be adjudged to the defendant."

By the 8th section of the Act of the 28th February, 1799, entitled "An act for providing compensation for the marshals, clerks," &c. it is provided, "that if any informer on a penal statute, and to whom the penalty, or any part thereof, if recovered, is directed to accrue, shall discontinue his suit, or prose-

App-8

cution, or shall be non-suited in the same, or if, upon trial, judgment shall be rendered in favor of the defendant, unless such informer be an officer of the United States, he shall be alone liable to the clerks, marshals and attornies for the fees of such prosecution ; but if such informer be an officer whose duty it is to commence such prosecution, and the court shall certify there was reasonable ground for the same, then the United States shall be responsible for such fees."

In cases where a prosecution is founded on the information of a person who is not a Collector, all fees, whether advanced or chargeable, should be paid by such person, or by the defendant.

But as it is made the duty of a Collector to prosecute for the recovery of all duties and penalties incurred, whoever may be the informer, he will not consider this as a rule that is to be invariably observed, but exercise, in its application, a sound discretion, making however such advances only as appear to him required by a regard to the public interests, to be repaid, whenever practicable, by the informer, in cases in which the costs are not recovered from the defendant.

In cases where a Collector is informer, he will advance such fees (other than those of the Attorney, in regard to whom the course to be pursued is already pointed out) as are *required* to be advanced, and where the penalty shall not be recovered, charge them, with such other fees as may be taxed to him, to the United States, under the conditions prescribed in the foregoing sections, and accompanied by the certificate of the court that there was reasonable ground for commencing the prosecution.  In which case he will likewise pay the Attorney employed by him his legal fee, charging and accounting for it in the same manner. Where the prosecution is decided in favor of the United States, but from the inability of the defendant the costs advanced by a Collector are not repaid, he will charge the same to the United States accompanied by the receipts therefor, and by the best evidence of such inability.

It follows that, in all cases of unsuccessful prosecutions wherein charges for fees against the United States are made, the certificate of the court that there was reasonable cause for commencing a prosecution, will be requisite to their allowance, excepting so far as regards the fee advanced, or agreed to be paid to the Attorney ; and, consequently that, in all other cases of unsuccessful prosecutions, where the court do not certify to such effect, the Collector, informer, or defendant will be chargeable with the costs.

There may seem, on the first view of the subject, an apparent injustice in requiring a Collector, where he is not informer and can of course reap no benefit from a prosecution, to advance fees in the first instance, and possibly eventually to pay them ; but any such unfavorable impression will be dispelled by observing that he is only bound to commence a prosecution when there is reasonable cause, that in judging of the propriety of commencing it he is allowed the aid of legal advice, which is always to be compensated either by the United States or the defendant, and that the duties incident to prosecutions are among those for which he receives his regular commission.  It may be added, that the moiety of the penalty when recovered receivable by him, who it is to be presumed will in most instances be the informer, will indemnify him for any loss incurred in other cases.

In cases where a penalty is recovered, and in which the costs of prosecution exceed the legal fees recovered, the excess of the former over the latter is to be deducted from the amount of the penalty received, and one moiety of the residue to go to the United States and the other moiety to the informer.  Before, consequently, in such cases the informer can receive his moiety of the penalty, if part of the costs of prosecution consist of compensation to the attorney beyond his legal fee, its allowance at the Treasury must be ascertained.  In rendering his Quarterly Accounts for settlement the Collector will accompany any such item by reference to the date of the letter of the Commissioner of the Revenue stating its allowance, and by the receipt of the attorney.

To avoid the intricacy that would otherwise attend the settlement of the accounts, it is considered advisable to let it be understood that a Collector going out of office will only be entitled to a commission on the costs of prosecution advanced or paid by him in suits determined previous to his ceasing to be in office, and that the commission in pending cases will be allowed to the Collector in office when the suits are determined.

The accompanying Forms and explanations, No. 53, exhibit the manner in which a Collector is to keep his accounts of costs of prosecution, and render them to the Commissioner of the Revenue, which it is to be held in remembrance is never to be done except where a charge is made against the United States, or a deduction made, as above stated, from the penalty recovered.

It will be advisable to attach these Forms to those already transmitted in relation to the Internal Duties.

I am, respectfully,

*Commissioner of the Revenue*

App-9

Circular No 8

Prosecutions
for
(Revolters?)

## **CERTIFICATE OF COMPLIANCE**

The Center filed an unopposed motion for leave to file this brief as amicus curiae and to file an oversized amicus brief up to 6,500 words. This brief contains 6,328 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

/s/ Andrew Weiner
Andrew Weiner

**CERTIFICATE OF SERVICE**

This is to certify that on this the 28th day of March 2025 the foregoing brief was electronically filed with the Clerk of the Court using the Court's CM/ECF system and was served on the parties by CM/ECF. In addition, four paper copies of the brief will be sent to the Clerk of the Court via overnight mail.

/s/ Andrew Weiner
ANDREW WEINER